## Case No. 12,302.

### SANDS' CASE.

[1 U. S. Law J. 15.]

District Court, S. D. New York. 1822.

BANKRUPTCY — JURISDICTION OF DISTRICT JUDGE UNDER THE ACT OF 1800 — INVESTIGATION OF ASSIGNEE'S ACCOUNTS — ENGLISH BANKRUPTCY LAWS.

[1. By the provisions of the act of 1800 [2 Stat. 19], and in analogy to the authority exercised by the lord chancellor in England under similar legislative provisions, the district judge has jurisdiction to investigate the condition of the assignee's accounts on the petition of a creditor or the bankrupt, for the purpose of ascertaining whether any, and what, dividends were due, and whether any surplus was payable to the bankrupt; but quære, as to whether the district judge possessed any summary jurisdiction to direct the payment of any dividends or surplus to the parties entitled, or whether they must be remitted to an action at law to recover the same.]

[2. The manner in which the investigation is to be made is entirely under the direction of the district judge. He may do it in person or through the agency of some proper officer designated by him.]

[3. In the course of this investigation, questions might arise which the court might deem proper to refer to a court of equity for a solemn and formal decision; but it would never be deemed necessary, either in this country or in England, to direct a bill to be filed to ascertain whether a sum of money had been received on a certain day by the assignees, and whether they had caused it to be properly credited in their accounts; nor would this method be resorted to to determine whether the assignees could become purchasers of the bankrupt's estate.]

[4. Neither by the bankruptcy act of 1800 nor by the judiciary act of 1789 [1 Stat. 73] did the circuit court have jurisdiction in bankruptcy cases, and it could not enjoin parties to a bankruptcy proceeding from seeking an investigation of the assignee's accounts, in a summary manner, by petition to the district court.]

[5. The origin and extent of the lord chancellor's jurisdiction in England over the commissioners and assignees in bankruptcy, considered, and its development traced under the various statutes by which the English bankrupt system was amended and perfected.]

[This was a petition by Comfort Sands, a bankrupt, for an investigation of the assignee's accounts, to the end that he might be required to pay over to the petitioner any surplus which might be found to be due him. The jurisdiction of the district judge to order any such investigation, or to require the assignees to appear before him, was strenuously contested.]

J. Wells, for bankrupt.

S. Jones and J. A. Hamilton, for assignees.

VAN NESS, District Judge. This case comes before me upon the petition of Comfort Sands, declared a bankrupt under the act of 1800, praying an investigation of the accounts of the assignees, and an order for the payment to him of an alleged surplus. The extent of the power and jurisdiction of the district judges under the bankrupt act of 1800 is an inquiry of acknowledged difficulty. I have felt the full weight of it from the commencement of the discussions in this case, and I must admit that the ingenious arguments of counsel employed on either side, although they may have aided my researches, have not been successful in removing my perplexities, or dissipating the obscurity in which the question is involved. This is a case of magnitude as to amount, and apparently of high interest to the parties. It was entitled, therefore, to due deliberation, and has received all the attention which my other avocations enabled me to give it. It is important, especially so in this case, that what is done should be legally and rightfully done, to the end that the parties may be safe in their future acts, and that the estate may be definitively settled.

The English bankrupt system has been in operation for nearly three centuries, and during the whole period of its existence has been the subject, not only of repeated revision and amendment, but of much animadversion, and of occasional reprobation. As a system, its defects are still numerous; and neither the sagacity of the bench, nor the ingenuity of the bar, nor the wisdom of parliament, have hitherto been able to obviate all the difficulties that oppose its just and faithful execution. Its imperfections are most visible in its inadequate provisions for the general administration of the system, and for the due execution of the various statutes that compose it. 'Tis true, however frail may be its foundation, or however equivocal its legal support, the present practice in England is sufficiently simple in its forms, and effectual in its operation. After years of doubt and controversy, all conflicts of jurisdiction have ceased, and the sole power of directing the execution and controlling the administration of the bankrupt system in all its departments, and in every stage of the proceedings, is now admitted to reside in the lord chancellor. But no man has hitherto successfully developed the sources of this comprehensive jurisdiction. Its existence and its exercise afford an instructive lesson on the imperfection of all human legislation, and on the tendency and disposition of all human institutions to accumulate power, and grasp at authority. It is an impressive illustration of the manner in which, in that country, custom, usage, and precedent are, by an acquiescence, silent in its progress, and imperceptible in its gradations, permitted to take the place of law and legislation. The chancellor's jurisdiction in bankruptcy, like much of the lex non scripta, had its origin, no doubt, in expediency, perhaps necessity, resulting from the absence of legislative regulation. The wisdom and discretion of the courts were sometimes necessarily substituted for higher authority. Successive precedents, unannulled by parliamentary enactments, grew gradually into usages, which, consecrated by time, and recognized as useful, now stand recorded as law in the written

history of judicial proceedings. It has repeatedly been admitted, by high authority, by successive chancellors, and by able men who have attempted to explain its foundations, that the chancellor's jurisdiction in bankruptcy is involved in great obscurity; and Lord Eldon, in a reported case, said, "There is great confusion in the language of every book relating to the subject." If the subject were not understood by the great men whose duty it was to administer this system of law, nor by those who in formal treatises have undertaken to investigate it, it would be worse than presumption in me, or in any of us here, to pretend to comprehend or to elucidate it.

It seems most probable that, by reason of the numerous defects, inseparable perhaps from so complicated a system, and the many difficulties constantly arising in the execution of these statutes, which could not easily be foreseen, nor readily remedied by legislative provisions, it was perceived, at an early day, to be necessary, in order to effectuate the salutary purposes of the law, that an ample authority should somewhere be exercised to direct and control all the proceedings in bankrupt cases. It is obvious, from the reports of early cases, that much practical evil resulted from the ignorance, perverseness or dishonesty of commissioners and assignees; and that creditors and bankrupts were exposed to abuses, which tended to defeat the benign objects of the legislature. It is perceptible, I think, in the imperfect accounts we have of the rise and the growth of the chancellor's jurisdiction, that these evils, manifested by repeated applications to the king's courts for relief, produced not only a general acquiescence in the limited jurisdiction he there exercised, but also a general solicitude on the part of the bench, the bar, and the commercial part of the community, that he would adopt a liberal construction of the statutes, and extend his jurisdiction, so as to repress the evils complained of, and advance the relief and the remedies contemplated by the acts.

Justified by the peculiar expediency of the measure, and supported by public sentiment, the great seal has, in progress of time, erected a splendid superstructure, upon a foundation which to us may seem perhaps unable to sustain it. Extrinsic aid, however, has upheld it; time has cemented the fabric; and all its parts have at length become firmly established. They are established, no doubt, in wisdom, and afford a refuge and a resting place to the victim of adversity; a sanctuary to which the poor in spirit and in fortune may fly from the hardy avarice and disciplined rapacity of relentless creditors.

Without attempting to elucidate further the mysteries in which the subject is confessedly involved, or to develope more at length the rise and gradual progress of this jurisdiction, I shall proceed to examine the provisions in the English bankrupt acts, from which it

is supposed to be derived, and the extent in which it is at present maintained, and exercised in practice. It will be necessary, then, to compare the British acts with the acts of congress of 1800, with a view to determine, if possible, what portion of the chancellor's jurisdiction was intended to be vested in the district judge, or what extent of authority, upon the usual principles of construction, may fairly be derived from the express provisions of the statute. Although the statute of 34 and 35 Hen. VIII. is universally considered as the first English bankrupt act, yet the germ of the system is, I think, to be found in a statute so far back as the reign of Edward III. It was confined in its operation to the Lombards, a description of foreigners, who were in the habit of settling temporarily in England, contracting debts, and then absconding. Perhaps, however, the general principle on which it is founded may be traced to a source still more remote and venerable, to the civil law, which, upon the application of creditors, most wisely constituted a guardian to superintend and control both the person and property of a prodigal. It was deemed an offence against the moral rectitude of the government to squander property obtained from others, and to the value of which they were entitled. So the statute of Hen. VIII., considered as criminal offenders "who craftily obtained into their hands great substance of other men's goods, and fled to foreign parts, or kept their houses," and conferred authority upon the high officers of the king's court and council "to take order as well with the bodies of such offenders" as their property. This is certainly the first statute that operated upon British subjects, and was applicable alike to all persons, without regard to their occupations. The lord chancellor, the lord treasurer, and other high functionaries which it enumerates, were themselves required to execute the powers and perform the duties which the lord chancellor has since been authorized to delegate to others. This statute was distinguished by three main features, which have all been established: First, it considered and treated the bankrupt as a criminal; secondly, it was not confined to any particular description of persons, but was applicable to every debtor who had fled the realm, or kept his house; and, thirdly, the lord chancellor, lord treasurer, &c. were themselves constituted what we now call commissioners. From this statute, the chancellor derived no peculiar power or jurisdiction whatever. It remained unmodified for 28 years, when 13 Eliz. c. 7, was passed, which changed the whole system. This obviously considers the bankrupt rather as an unfortunate trader than a criminal offender. Its operation is confined to merchants and traders. The lord chancellor is authorized to delegate by commission under the great seal, to persons of his own selection, the powers previously vested only in the lords. By the ninth section he has authority

to punish for concealing or aiding to conceal the person of the bankrupt. This is all the direct and exclusive authority granted by this act to the chancellor. The power given to appoint commissioners presents, to be sure, an important and interesting modification of the system, as it discloses the early and remote source from which is derived the present ample jurisdiction of the great seal.

It is worthy of remark that the three next statutes, to wit, 1 Jac. I., 21 Jac. I., and 13 & 14 Car. II., passed at intervals that embrace a period of 135 years,—that is, from 1570 to 1705,—never mention the lord chancellor, nor convey to him any additional power. During this period, the jurisdiction in bankruptcy rested entirely on 13 Eliz.; and the right to advise the commissioners in the execution of their duties was exercised in common with all the king's courts; or, at least, the authority of the chancellor, as now supposed to be conveyed by the 2d section of 13 Eliz., was not at that time recognized as exclusive. In cases referred to by Christian we see that in 1583, 1602, and 1619 the assistance and advice of the court of common pleas were asked and given. The first recorded application to the chancellor is stated to have been made in 1676, more than a century after he was invested with the power of appointing the commissioners. It was made to obtain an order to the commissioners to admit a debt which they had disallowed. The chancellor at first expressed a repugnance to interfere, but finally directed its admission; and the right to order a debt to be allowed or expunged is now said to be the most efficient and extensive part of his jurisdiction. But to proceed with the provisions of the statutes, which directly confer jurisdiction upon the chancellor; for that, at the present, is my only object. The 4 & 5 Anne, c. 17, introduced many important changes in the system as it then existed, but conveyed little new power to the chancellor. The 2d section authorizes him to enlarge the time for the bankrupt's surrender, and is the only provision connected with this branch of my inquiry. This was, however, an important statute in other respects. It is expired, but its most material and useful provisions will be found in 5 Geo. II.

5 Anne, c. 2, is worthy of attention for having first authorized and directed the choice of provisional assignees by commissioners, and of general assignees by the creditors. The chancellor derived no direct concession of authority either from this statute, which expired, nor from the 10th of the same reign. 5 Geo. I. c. 24, was the next statute on the subject of bankruptcy. It is expired, but it was an important act. It incorporated all the improvements of antecedent statutes, and introduced much new matter. The 24th section gives the chancellor power to remove the assignees, and vacate the assignment. These are two copious sources of jurisdiction. They were transferred verbatim to 5 Geo. II. 7 Geo. I. contains nothing relevant to this inquiry. We come next to 5 Geo. II. c. 30. This is the most operative and comprehensive of the existing statutes. It comprehends the most useful provisions of the expired statutes of Anne and George I., and in several instances modified the laws then in force. It had become necessary by the expiration of the 5 Geo. I., which threw the system and the proceedings instituted under it into great confusion. It is long and minute in details, and I shall only refer to such parts of it as relate to the power of the chancellor. The third section authorizes him to enlarge the time for the bankrupt to surrender, and is taken from a corresponding provision in 5 Anne, transferred to 5 Geo. I. The 10th requires the chancellor's confirmation of the certificate of the bankrupt's conformity. It is taken from 5 Geo. I. c. 24, §§ 5, 16. By the 23d section the petitioning creditor must give bond to the chancellor to prove his debt and the act of bankruptcy. The 24th section repeats from the 26th section of 5 Geo. I. c. 24, the authority to supersede the commission. The 31st gives authority to remove the assignees, and is taken from the 24th section of 5 Geo. I. c. 24. By the 36th section the chancellor may discharge the bankrupt when committed by the commissioners. The 41st gives him power to direct the proceedings to be recorded, and appoint a secretary. It is taken from the 30th section 5 Geo. I. c. 24. Several other statutes were passed during the reign of Geo. II. and many in that of Geo. III., altering or amending the bankrupt acts of England and Ireland. But I have found nothing in them enlarging the chancellor's power or jurisdiction, except the 12th section of 49 Geo. III. c. 121. This authorizes the chancellor to order the payment of dividends by the assignees, instead of leaving the creditors to their actions against them. This provision is closely connected with the question before me, and will presently be made the subject of more particular remark.

From this analysis of the British bankrupt acts, it will be seen that the direct and express authority of the chancellor in bankruptcy depends upon a few general provisions. They are certainly very comprehensive in their terms. They reach over a wide field of jurisdiction, and, upon common-law rules of construction, convey much incidental power. The authority expressly delegated is—1st. To appoint the commissioners. 2d. To supersede the commission. 3d. To enlarge the time for the bankrupt's surrender. 4th. To punish for concealing him. 5th. To remove the assignees and appoint others. 6th. To order them to pay dividends. In virtue of these enumerated delegations of power, the whole administration of a bankrupt's effects is now said to be vested in the chancellor, although this administration is given immediately by the legislature to the commissioners; yet the chancellor, as is now conceded, in virtue of his power to appoint and to remove, to create and to annihilate these officers, possesses

the authority to control and direct them in all their acts, and thus effectually to exercise the whole jurisdiction. It would be very difficult, and not necessary, to enumerate the very various instances in which his jurisdiction is said to be derived from his superintending authority over the commissioners. No case can now be suggested in which he would not interfere to direct and control the commissioners, and all others through whose agency the commission which he issues is to be executed. An appeal lies to him from all their decisions, and all their proceedings are subject to his revision. 2 Madd. Ch. Prac. p. 452.

The commissioners are said to have only an authority, not a jurisdiction. That is vested in the great seal. Ld. Raym. 580. They are called "assistant judges," given to the chancellor to enable him to execute the bankrupt laws. His control over them is continual. 2 Madd. Ch. Prac. p. 452. I am supported, too, in stating the extent of this jurisdiction by both Cook and Cooper, and especially Christian, on whom I have chiefly relied. This view of the subject is also confirmed by various cases in the two Veseys, Atkyns, &c. Lord Hardwicke has contributed much to the extension and firm establishment of the chancellor's authority in bankrupt cases. He took a very large principle as to the jurisdiction in bankruptcy. He thought that, the legislature having committed that jurisdiction to the lord chancellor, he had, when he exercised it, all the authority he possessed when sitting in the court of chancery. Ex parte Cawkwell, 19 Ves. 233. 1 Rose, 313.

The reasoning by which this construction of the statutes and this jurisdiction is maintained I shall not undertake to examine farther. I have sought only to ascertain the extent of it, and the manner in which it is exercised. The extent of it is, I think, sufficiently apparent. The jurisdiction is not in the court of chancery, but in the individual who holds the great seal. 2 Christ. Bankr. 214, 215; 6 Ves. 781. It is exercised summarily upon petition always, unless the chancellor in his discretion thinks proper to direct a bill to be filed with a view to a more solemn and formal investigation of a difficult question, as where property is sought to be divested, or to ascertain whether a disputed debt is due. 2 Christ. Bankr. 220, 225. There is no appeal from the chancellor's judgment in bankruptcy; and for this reason, too, he sometimes gives the party leave "to bring an action, or to try the question by an issue, that it may be decided by the courts of law and carried up." Or "if it is an equitable question of importance, he gives leave to file a bill, that it may be carried to the house of lords." 2 Christ. Bankr. 232; 2 Ves. & B. 215. But in every case he can give the same relief upon a petition as upon a bill filed. 1 Atk. 76. His order upon a petition in bankruptcy operates as effectually as

upon a bill filed. Billon v. Hyde, 1 Ves. Sr. 327; 1 Madd. Ch. Prac. 131.

It is now proper to refer to the act of congress, to ascertain whether its provisions upon the principles of construction adopted in England, convey to the district judge the same jurisdiction, as is exercised by the chancellor over this branch of the bankrupt system. Without looking into the minor details of the act, it will be enough to show that, although it does not contain the provisions in the late acts of parliament, which give to the chancellor direct authority over the assignees, yet it contains those precisely upon which the general jurisdiction in bankruptcy is maintained. By the second section the district judge is authorized to appoint the commissioners. It adopts, with only the necessary and proper variations, the words of 2d section of 13 Eliz. By the third section he is authorized to supersede the commission in cases there specified. Under the 19th, he may enlarge the time for the bankrupt to surrender. The 28th authorizes him to issue a new commission where the bankrupt has given a preference under the first. Under the 36th, he grants the certificate of the bankrupt's discharge. Under the 47th, he establishes the compensation to the commissioners. The 51st directs the proceedings to be filed in the office of the clerk of the district court. The 52d directs the judge in his discretion to grant a trial by jury in certain cases. Among these will readily be recognized all the great provisions of the British acts upon which rests the chancellor's general authority, and the same course of reasoning which confers that upon him must sustain the jurisdiction of the district judge. The jurisdiction is also personal here. It is not in the district court, but in the individual who happens to hold the office of district judge. For this reason there can be no appeal from his decision in bankruptcy. Judge Cooper, in his treatise, presumes there is, but he is obviously mistaken. If the decisions in bankruptcy be not decisions or decrees of the district court, they cannot be the subjects of appeal, under the "Act to establish the judicial courts of the United States." There is no appeal provided for in the act which confers the jurisdiction, nor in any subsequent law. It therefore cannot and does not exist.

From this summary view of the general jurisdiction in bankruptcy, as derived from the comprehensive provisions of both the British and American acts, I shall proceed to examine the authority of the chancellor there and the district judge here over the assignees. In many cases, for many purposes, and to a certain extent, the great seal has always exercised jurisdiction over the assignees, as incident to its general authority, and as necessarily flowing from its right to superintend the acts done in virtue of the commission it issued. Its right in other instances to control and coerce the assignees is expressly conferred by statute. Assignees originally form-

ed no part of the machinery by which this system was put in operation. In the time of the lords, as they are called, as well as for the time subsequent to 13th Eliz., the commissioners themselves collected the estate, and distributed the dividends. The 2d section of 13 Eliz. c. 7, gave the commissioner power to dispose of the bankrupt's lands, goods, and chattels, upon which a great doubt arose whether this embraced debts due or to be due to the bankrupt. This historical fact explains the preamble to the 13th section of the next statute,—that of Jac. I. c. 15,—which gives the commissioners the power to grant and assign, or otherwise to order and dispose all or any of the debts due or to be due, to and for the benefit of the said bankrupt. Under this statute it soon became the practice to assign all the debts as a matter of convenience to one person, in trust for himself and the rest of the creditors; and this assignee was of course chosen by the commissioners alone. This practice continued.for a century, and rested solely on the authority of the statute of James. These assignees were styled the "assignees of the commissioners." This mode of managing the estate was found useful and convenient; and in 5 Anne, c. 22. § 4, general assignees of the bankrupt's estate were directed to be chosen by the creditors. The next section (5) authorizes the temporary or provisional assignee of the commissioners.

These provisions have been transferred from one statute to another not materially altered, and now stand in force in 5 Geo. II. and in our act of 1800. It is said in one of the books, Chit. 1, 315) that "there is a particular mystery thrown over the jurisdiction in bankruptcy, which can only be developed by attention to the historical progress of the law." This branch of it,—the authority of the chancellor over the assignees,—is certainly involved in some perplexity; but I have traced with some care the means successively employed to obtain from the assignees the fund they had collected. Before the statute of James, which first authorized assignments, the commissioners who then had the distribution of the estate were liable to an action by each creditor for his dividend. When, in virtue of that statute, assignments in trust for the creditors were introduced, the commissioners took a bond from the assignees with proper covenants, and if they refused to pay over they brought suits on the bond. Thus the practice stood until 51 Anne, which authorized the appointment or choice of general assignees of the bankrupt's estate. Here follows a period of 12 years from 5 Anne, or 1706, to 5 Geo. I., or 1718, during which I have not been able to ascertain with precision the course pursued against assignees who refused to pay over dividends. I had not within my reach the books reporting the cases during that period. It is pretty evident, however, that creditors were still obliged to resort to suits

at law or in equity to obtain their dividends, and that the chancellor did not interfere summarily to compel them to pay over the funds in their hands. 5 Geo. I. c. 24, § 24, gives the chancellor much additional power. By that section he is authorized "to vacate the assignment and make such order in the premises as he shall think just and reasonable." This section was transferred to 5 Geo. II. c. 30, § 31.

There is an inaccuracy, even in Christian, in speaking of the introduction of this improvement in the bankrupt system. Christ. Bankr. 1, 316. In a note he states that the chancellor never exercised a summary jurisdiction over assignees, until the 31st section of this statute was passed, whereas it was copied verbatim from Geo. I. c. 24, § 24. In consequence of this new authority, Lord Hardwicke called an assignee "an officer of the court," "an officer of the commission," and held them strictly subject to the direction and control of the great seal. 1 Atk. 90. Upon petition, he ordered assignees to account and to pay dividends, although creditors might still proceed at law, if they preferred that course. But 49 Geo. III. c. 121, § 12, puts the whole subject under the exclusive jurisdiction of the great seal. It declared that no action should be brought by a creditor for his dividend, but that he should petition the lord chancellor, who shall make his order for the payment of the dividend and interest, if the case shall require it. Thus the jurisdiction of the chancellor has been consummated. It now embraces the whole system. It is adequate to every case and every emergency that can rise in the course of its administration. He grants relief and redress to all parties interested in the proceedings, the bankrupt as well as the creditor, and that in a summary way. But these important provisions of Geo. II. and 49 Geo. III. formed no part of our bankrupt act. The last was not enacted in England until after our act was repealed; and the other, although in part transferred to it, received a fatal modification. The 8th section of the act of congress, which was intended as a substitute for the 31st of 5 Geo. II. c. 30, gives the right and the power to remove the assignees, not to the judge, but to the creditors, and thus frustrates its original object and efficacy. The alteration was made. no doubt, without adverting to the important effect it was to produce upon the administration of the system.

The chancellor's summary jurisdiction over the assignees commenced only with his power to remove them. It was never exercised before. 1 Christ. Bankr. § 315. And that power is not possessed by the district judge. He must, of course, abstain from the exercise of a jurisdiction which in England it was supposed to confer. The jurisdiction here, then, over the assignees, stands upon the ground that it did there prior to the year 1718. Before that period, the chancellor did

not proceed against the assignees, in a summary way, to compel them to pay over money either to the creditors or to the bankrupt; but he always held a general inspection over the proceedings had under the commission which he issued. It was not only conceded as his right, but believed to be his duty, to see that those who in any manner derived their authority under it proceeded in conformity to law; that neither the privileges nor powers it conferred were neglected or abused. Thus it is said in one of the cases (1 Burrows, 476) that the bankrupt act gives the management of the estate to persons chosen by the creditors, but under the direction of the commissioners, and the general control of the great seal. The creditor and the bankrupt had at all times a right to petition the chancellor for an investigation of the proceedings under the commission, that the one might ascertain whether any, and what, dividend was due to him; and the other, whether he was entitled to a surplus. These examinations were always instituted and conducted under the direction of the great seal. They were never compelled to invoke the aid of other tribunals to obtain a view of what had been done under its authority. I would not be understood to use these terms in a vague and indefinite sense, but to mean the power only which is necessary to a due and efficacious exercise of that expressly given.

It cannot be supposed that the judge, after having granted the commission, was to cast it to the winds, without regard to what was done under it; without seeing that the officers whom it called into existence and the person who derived authority from it, executed faithfully the statute under which it was issued. This is the inquiry and the only proceeding I propose now to institute. I propose to inquire whether the commission issued in this case has been executed, and how? Whether the estate of the bankrupt has been collected, and how disposed of? If, when the proceedings are fully developed, and the facts fairly stated, there shall appear to be a surplus it will then be time enough to consider how the bankrupt or his representative is to obtain it. With my present view of the subject, I should decline further interference; and it may be that here, though not in England, he would have to resort to his action at law, or his bill in equity. As to the manner in which the inquiry is to be made, I consider that to be entirely under the direction of the judge. He may do it in person, or through the agency of others. It is said by Lord Hardwicke, in a case in 2 Ves. Sr. 388, that the proceedings under commissions of bankruptcy have been framed by way of analogy to the proceedings of the court of chancery; and wherever an account is to be taken the court, by its ancient constitution, is to be aided in taking it by some proper officer. As both jurisdictions are there vested in the same person, it is more convenient to refer the accounts in bankrupt

cases to a master. For this reason alone that officer is always selected. Here it may be to the clerk or others, at the direction of the judge.

I have now proceeded in this investigation as far as was rendered necessary by the case before me. It is evident, I think, by reason of omissions and defects in the bankrupt act of 1800, that the jurisdiction of the judge is too limited to administer effectual relief in all cases to the bankrupt and creditors against the assignees. Over the commissioners it appears to be sufficiently ample, and upon them I shall make an order, with a view to obtain the information sought for by the petition of the bankrupt. This, it seems, is the only and the first case in this district in which a proceeding like the present has been instituted, and I am free to admit that it is attended with some difficulties. If the legislature should, at any future period, pass another bankrupt act, it seems to me important that some adequate provisions should be introduced to establish and define the ultimate jurisdiction in cases of this sort. Neither the bankrupt nor the creditors should be left at any stage of the proceedings to tedious and doubtful remedies, in order to arrest and punish abuses, nor compelled to invoke the aid of other tribunals to effectuate the great objects of the act. The district judges, if invested with the jurisdiction in the first instance, should be clothed with ample power to control and direct the conduct and proceedings of all persons directly or indirectly acting under the commission; the assignees should be made accountable to them, in every stage of their proceedings, and, upon the petition of the bankrupt or a creditor, liable to their order for the payment of a surplus or dividend in their hands. Proper modifications of the 31st section of 5 Geo. II. c. 30, and 12th of 49 Geo. III. c. 121, seem indispensable to a prompt and effectual execution of the system. The wise and discreet spirit of all our institutions would naturally suggest an appeal from the district judges to the circuit judges, or still farther, if that should be deemed expedient. This would be compatible with the well-known course, simplicity, and order of our judicial establishments, and would avoid all interference and collision of authority or jurisdiction.

Upon the delivery of the foregoing opinion, the assignees conformed to the order made by the judge, and rendered their accounts to him, in relation to the bankrupt's estate. To these accounts Mr. Sands filed sixteen exceptions, and it was decided by the judge that they were proper exceptions; that a part of them involved simple questions of fact, and a part of them questions of law, proper for the district judge to decide, and they fell within his exclusive jurisdiction: and that, if the errors alleged in the exceptions did exist, he should order them to be corrected; that questions might arise in the progress of such an inves-

tigation as then engaged the attention of the court; which it would be proper, to refer to a court of equity for a solemn and formal decision; and whenever they might arise he should refer the parties to that jurisdiction. But he conceived that the chancellor in England, sitting in bankruptcy, as he himself was then sitting, would never direct a bill to be filed to ascertain whether a sum of money had been received by the assignees on a certain day, and whether they had caused the sum to be credited in their accounts; nor would he inquire in that manner whether the assignees could become purchasers of the bankrupt's estate.

Recently, an application was made to his honour, Judge Livingston, by a bill in equity, to take cognizance of the case in the circuit court of the United States, and for his granting an injunction to enjoin the bankrupt and his attorneys, counsel, and solicitors from proceeding farther in the district court. It was decided by the circuit judge that he had no jurisdiction in the matter, there being no provision made for the exercise of the jurisdiction of the circuit court, either by the bankrupt law of 1800 or by the judiciary act of 1789, or by any other law. The district judge was therefore left to proceed in accordance with his own opinion.